JUDGE CARTER

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

11 CIV 9505



| | |
|---|---|
| **ADVANCED AEROFOIL TECHNOLOGIES, AG**, a Swiss Corporation, **ADVANCED AEROFOIL TECHNOLOGIES, INC**. a Delaware Corporation, and **ADVANCED AEROFOIL TECHNOLOGIES, GmbH**, a German Corporation, | ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) Case No: ) |
| v. | ) ) |
| **THOMAS TODARO, ANTHONY CHALDER, MARK TARBY**, as Individuals, **ADVANCED ENGINEERING TECHNOLOGIES, INC.**, a New Jersey Corporation, **FLC FLOWCASTINGS, GmbH**, a German Corporation, and **PETER KONRAD, HERVE FLUTTO, DANIEL ABBASI, FABIAN KORB, CHARLES BYRD** and **BERND LEONHARDT** as individuals, | ) ) ) **JURY TRIAL REQUESTED** ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES[1]

Plaintiffs, Advanced Aerofoil Technologies, AG (hereinafter "AAT AG"), Advanced

Aerofoil Technologies, Inc (hereinafter "AAT, Inc.") and Advanced Aerofoil Technologies,

GmbH (hereinafter "AAT Germany") (or collectively "Plaintiffs"), by their attorneys, Cronin &

Co., Ltd., and complaining against Defendants, Thomas Todaro, Anthony Chalder, Mark Tarby,

Advanced Engineering Technologies, FLC Flowcastings, GmbH, Charles Byrd, Daniel Abbasi,

---

[1] Pursuant to a termination agreement with some of the Defendants, Plaintiffs are filing a claim for arbitration with the American Arbitration Association in New York. In this matter, Plaintiffs seek injunctive relief against all Defendants and, additionally, damages against Defendants FLC Flowcastings, GmbH, Abbasi, Konrad, Korb, Flutto and Leonhardt.

Herve Flutto, Peter Konrad, Fabian Korb and Bernd Leonhardt (hereinafter, collectively "Defendants"), state:

## NATURE OF THE ACTION

1.      This case is about corporate theft and self-dealing on a grand scale, committed by FLC Flowcastings, GmbH (hereinafter "Flowcastings"), its corporate executives and certain employees. Plaintiffs are developers of precision investment castings for the power generation and transportation industries, and Flowcastings is a corporate competitor formed by Plaintiffs' former employees using Plaintiffs' technologies and resources.

2.      Plaintiffs bring this action for damages and equitable relief against Defendants. As set forth in the factual recitation below, Flowcastings, a direct competitor of Plaintiffs, has violated federal and state law by misappropriating sensitive trade secrets and other confidential and proprietary information of the Plaintiffs, and putting such wrongfully acquired information to improper use. Defendants Byrd, Flutto and Todaro, all former executives of Plaintiffs and now founding members of Flowcastings, gained unauthorized access to Plaintiffs' computer systems, misappropriated Plaintiffs' trade secrets and confidential business information, and used such information to start Flowcastings.

3.      Plaintiffs uncovered Defendants' scheme on October 13, 2011, when R. Seth Armstrong, acting Director of AAT, Inc., was inadvertently copied on an email from a company supplier who was responding to an October 10, 2011 email from AAT AG's former Chief Technical Officer, Herve Flutto (hereinafter "Flutto"). In Flutto's October 10, 2011 email to the supplier he enquired about supplying alloy for a new operation he was starting up: Flowcastings. Flutto attached the PowerPoint Presentation to his email announcing Flowcasting's offered

2

products, its technology and its "robust management team," all of whom are former members of Plaintiffs' senior management team.

4.      Through this Verified Complaint, Plaintiffs seek to stop Defendants' illegal intrusions and theft, to prevent Defendants from using the materials and information they have illegally acquired to compete with Plaintiffs, and to recover damages and attorneys' fees.

## THE PARTIES

5.      Plaintiff AAT AG is a Swiss Corporation with its principal place of business in Riedstrasse 7, CH-6330 Cham, Switzerland. AAT AG is the parent corporation of AAT, Inc. and AAT GmbH. AAT AG is a manufacturer of precision investment castings for the power generation and transportation industries.

6.      Plaintiff AAT, Inc. is a Delaware Corporation with its principal place of business in Chicago, Illinois. AAT, Inc. is a sister corporation of AAT, GmbH and was incorporated in the United States to expand and build manufacturing facilities in the United States and to serve customers in the United States and Canada.

7.      Plaintiff AAT GmbH is a German Corporation with its principal place of business located at Gottlieb-Keim-Str. 65, 95448 Bayreuth, Germany. AAT GmbH is the European manufacturing facility for AAT AG's precision investment castings.

8.      Defendant Thomas Todaro is domiciled at 130 Gunn Road, Branchville, New Jersey 07826-4167. Todaro is the former Technical Director of AAT Germany and currently serves as the Chief Technical Officer of Flowcastings. While employed with AAT Germany, Todaro was an employee of its American sister company, AAT, Inc. Plaintiffs are informed and believe, and based thereon allege that, Todaro is an owner, member, investor, shareholder or otherwise affiliated with Flowcastings.

9. Defendant Advanced Engineering Technologies is a New Jersey Corporation with its principal place of business in Branchville, New Jersey. Plaintiffs are informed and believe, and based thereon allege that, Advanced Engineering Technologies was incorporated and is currently owned by Defendant Thomas Todaro.

10. Defendant Anthony Chalder is domiciled at 32 North Street, Milford, New Hampshire 03055-4019. Chalder is a former employee of AAT, Inc. and upon information and belief is currently employed by Flowcastings.

11. Defendant Mark Tarby is domiciled at 43 Livingston, Avenue, Edison, New Jersey 08820-2340. Tarby is a former employee of AAT, Inc. and upon information and belief is currently employed by Flowcastings.

12. FLC Flowcastings, GmbH, is a German Corporation. Flowcastings maintains a manufacturing facility located at Wölfelstr. 7, 95444 Bayreuth, Germany. Plaintiffs are informed and believe, and based thereon allege, that Byrd, Abbasi, Todaro and Flutto are owners, members, investors, shareholders or otherwise affiliated with Flowcastings. Flowcastings is in the business of manufacturing precision investment castings for the power generation and transportation industries in direct competition with AAT.

13. Defendant Charles Byrd Wölfelstr. 7, 95444 Bayreuth, Germany. Byrd is the former Chief Executive Officer of AAT Germany and currently serves as the Chief Executive Officer of Flowcastings. Plaintiffs are informed and believe, and based thereon allege, that Byrd is an owner, member, investor, shareholder or otherwise affiliated with Flowcastings.

14. Defendant Daniel R. Abbasi is domiciled at 16 Griffith Rd., Riverside, Connecticut, 06878. Abbasi currently serves as President of Flowcastings. Plaintiffs are

4

informed and believe, and based thereon allege, that Abbasi is an owner, member, investor, shareholder or otherwise affiliated with Flowcastings.

15.     Defendant Herve Flutto is domiciled at Panoramaweg 15, 5070 Frick, Switzerland. Flutto is the former Chief Financial Officer of AAT Germany and currently serves as Chief Financial Officer of Flowcastings. Plaintiffs are informed and believe, and based thereon allege, that Flutto is an owner, member, investor, shareholder or otherwise affiliated with Flowcastings.

16.     Defendant Peter Konrad is domiciled at Zechenring 30, 91257 Pegnitz, Germany. Konrad is the former Engineering Manager of AAT Group and currently serves as the Product Engineer Manager of Flowcastings.  Plaintiff are informed and believe, and based thereon allege that, Konrad is an owner, member, investor, shareholder or otherwise affiliated with Flowcastings.

17.     Defendant Fabian Korb is domiciled at Bertastr. 36, 90480 Nürnbeg, Germany. Korb is a former Engineer at AAT Group and currently serves as an Engineer of Flowcastings.

18.     Defendant Bernd Leonhardt is domiciled at Loren-Allec 9, 8610 Uster, Switzerland.  Leonhardt is a former Program Manager at AAT Group and currently serves as Program Manager of Flowcastings.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over the subject matter and parties to this action pursuant to 28 U.S.C. § 1332(a).  This Complaint alleges violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and thus presents a federal question, over which this Court has jurisdiction pursuant to 28 U.S.C. § 1331.

20.     This Court has personal jurisdiction over the Defendants because the parties consented to this jurisdiction in the termination agreement signed by parties.  Under its terms, the parties are required to pursue injunctive relief in this jurisdiction.

21.     This Court also has supplemental jurisdiction to adjudicate Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

22.     Venue is proper in this District pursuant to 28 U.S.C. 1391(b-c) and 1400(b) because Defendants are subject to personal jurisdiction in this District and do business in this District.

### ALLEGATIONS OF FACT

**A.**     **_Structure of AAT Entities_**

23.     Plaintiffs are the developers of innovative precision investment castings for the power generation and transportation industries, and of a proprietary method of manufacturing those castings.  Plaintiffs use this technology to provide precision castings to customers around the world, including, but not limited to Rolls Royce and Siemens.   Consequently, Plaintiffs have collected and developed, at their own expense, significant and critical information on its products, pricing markets, supply costs, client contacts, marketing data, project forecasts and research studies.

24.     Under the corporate structure, AAT AG, AAT, Inc. and AAT Germany jointly control and manage their venture, and combine their property, skill and knowledge, by, _inter alia_, together participating in a development program; sharing access to intellectual property and offices; participating in joint board meetings to direct the business of the companies; and consulting each other in connection with the retention or termination of key employees.

25.     Plaintiffs limit access to their proprietary technologies, and permit only certain employees in trusted positions to access such information.  By virtue of their executive level standing with the AAT entities, many of the Defendants were granted unlimited and unfettered access to Plaintiffs' technologies.

26.     Plaintiffs spent extensive time and resources developing their proprietary technology and machinery to ensure that the products leaving the manufacturing facility are of the finest quality and craftsmanship.  Plaintiffs have obtained International Organization for Standardization (ISO) 9001 certification – vital to a manufacturer entering the marketplace. Finally, Plaintiffs spent considerable resources and time establishing relationships with their clientele and maintain valuable long-term relationships and substantial good-will with their customers.  Plaintiffs' long-standing customer relationships and good-will are of paramount significance to its business reputation and success.

**B.     _Defendants' Flowcastings Strategy_**

27.     At least as early as the fourth quarter of 2010, former high-level executives of Plaintiffs, Charles Byrd and Herve Flutto, developed and began to execute a scheme whereby they would form a venture to compete with Plaintiffs, using Plaintiffs' technology and resources, in order to preempt Plaintiffs' entry into the DS/SX markets.  Defendants sought to eliminate Plaintiffs as a viable competitor in that market by misappropriating Plaintiffs' proprietary technology, using that stolen technology to manufacture DS/SX parts that Defendants could represent to Plaintiffs' customers and the world as "their" innovative technology, thereby injuring Plaintiffs' business to such a degree that Defendants could convince Plaintiffs' current and prospective customers to dump AAT and contract with Defendants.  Defendants' strategy was to pillage Plaintiffs' resources and sabotage their operations.

28.    Indeed, by the fourth quarter of 2010, Defendants Byrd and Flutto – acting under the guise of seeking additional capital for Plaintiffs' operations – began contacting prospective investors for Flowcastings.   To facilitate their scheme, Byrd contacted Defendant Daniel Abbasi (who at that time was an employee and former colleague of Byrd's at MissionPoint Capital) and offered him a position working as an outside fundraiser to be paid by AAT Germany.   Plaintiffs are informed and believe, and based thereon allege, that Defendant Abbasi was advised from the outset of Defendants' actual intent to start a competitor and was directed by them to identify investors for Flowcastings only.   After Plaintiffs' shareholders became aware that Byrd and/or Flutto were contacting outside investors, Byrd and/or Flutto intentionally stalled conversations with these investors in order to allow Byrd enough time to propose an alternative investment opportunity with Flowcastings. Rather than secure expansion capital for Plaintiffs, Byrd secretly advised Abbasi to put his fund-raising efforts on hold and return to the relationships he had built with certain investors and propose to them an opportunity to become initial investors in Flowcastings.

29.    Plaintiffs are informed and believe, and based thereon allege that Abbasi[2] secretly told investors that Plaintiffs were in serious financial trouble. Using this false accusation, Abbasi directed investors to forego investing with Plaintiffs and, instead, invest with the startup: Flowcastings.  Defendants had no intention to raise capital for Plaintiffs.  Rather, Defendants intended to prevent more substantial involvement from Plaintiffs' shareholders, so that their scheme to steal from Plaintiffs would not be disrupted.

---

[2] As compensation for his work, Abbasi was named President of Flowcastings and he is recognized as a founding member of the company.

30.     Despite having an obligation to protect and enforce Plaintiffs' rights, Defendants Byrd and Flutto ignored their contractual and fiduciary obligations and stole from Plaintiffs their confidential, proprietary and trade secret information.

31.     In March 2011, Defendants Byrd and Flutto began to execute their exit strategies from Plaintiffs' employ – which included misleading Plaintiffs' corporate counsel into drafting documents that created for themselves amendments to their employment agreements that were adverse to Plaintiffs' shareholders (e.g. waiver of non-compete clauses, increase in severance compensation, additions of certain trigger events).   After deliberately misleading Plaintiffs' corporate counsel, Defendants backdated the amendments to their employment contracts to November 30, 2010 and then deceitfully presented them to the Plaintiffs at the end of March 2011, hours after the triggering events in their employment contracts had been officially posted in the corporate register.   Byrd then claimed that as part of a random housekeeping exercise, he discovered the contract amendment from November 30, 2010 that indicated that he had been constructively dismissed from his position and was now entitled to a substantial severance package – one that he self-created. *See* Affidavit of Paul S. Wolfe, attached hereto as ***Exhibit A***.

32.     Although Byrd constructively abandoned his position in March 2011, Defendant Flutto remained.   Plaintiffs are informed and believe, and based thereon allege, that Flutto remaining at with Plaintiffs was a strategic decision on the part of the Defendants – one that allowed Flutto to continue to covertly work for the benefit of Flowcastings while being compensated by Plaintiffs.

33.     Indeed, Plaintiffs would discover that Defendant Flutto was actively and exclusively working for the benefit of Flowcastings in the Spring 2011 – following Defendant Byrd's departure.   In fact, presumptively after establishing funding for Flowcastings, Flutto's

work in April 2011 included seeking online graphic designers to design a logo for Flowcastings in a work request he titled: "flowcastings-needs-logo."

34.     Defendant Flutto was terminated from his position in May 2011 following an internal investigation by Plaintiffs that revealed Flutto and Byrd deliberately misled corporate counsel in making amendments to their employment contracts in March 2011 and then falsified documents to back-date those amendments to November 2010.

35.     Byrd and Flutto coordinated the timing of their departures from Plaintiffs, and have formed Flowcastings to exploit their knowledge of Plaintiffs' trade secrets and confidential business information and thereby compete unfairly against Plaintiffs.

36.     Byrd and Flutto intend to quickly develop the Flowcastings operations in order to enter into the DS/SX markets.   Defendants have acknowledged that Flowcastings was incorporated to serve exclusively as a DS/SX foundry that will pursue only that market.  Much of Defendants knowledge about the DS/SX market consists of protected confidential information acquired during and as a result of Defendant Byrd and Flutto's fiduciary relationship with Plaintiffs.

**C.    *Flutto and Byrd Recruit Specific Employees***

37.     By virtue of their intimate knowledge of Plaintiffs' operations, Defendants Byrd and Flutto began to selectively pick those employees they know possess knowledge of and access to Plaintiffs' safeguarded confidential, proprietary and trade secret information.

38.     Plaintiffs would later learn that in order to incentivize certain employees to leave AAT Germany and/or AAT, Inc., Flutto and Byrd steered generous bonuses to those employees they had identified for positions at Flowcastings.  Defendants did this in order to build loyalty

10

with certain employees so that they would be more willing to accompany Defendants to Flowcastings.

39.     As certain AAT Germany and/or AAT, Inc. employees began to accept employment with Flowcastings, Flutto and Byrd directed them to access and download on external hard drives Plaintiffs' confidential, proprietary and trade secret information relating to its business and its clients, including but not limited to term sheets, agreements, models, projections, test results, marketing and pitch materials, and notes about client negotiation points and then, on information and belief, directed them to sabotage their computer files and data and destroy all testing results related to Plaintiffs' products.

40.     Plaintiffs are informed and believe, and based thereon allege, that Defendants Flutto and Byrd have used and disclosed Plaintiffs' trade secret and other confidential information contained on external hard drives to contact, solicit, transact and/or attempt to transact business with, among others, Plaintiffs' current and prospective clients.

**D.     _Todaro Becomes Part of the Defendants Scheme_**

41.     Plaintiffs are informed and believe, and based thereon allege, that the first employee identified by Byrd and Flutto for a position with Flowcastings was Plaintiffs' former Technical Director, Thomas Todaro.  Further, Plaintiffs are informed and believe, and based thereon allege that Todaro secretly accepted a position with Flowcastings sometime during the first quarter 2011.

42.     Plaintiffs are informed and believe, and based thereon allege, that Defendants Flutto, Byrd and Todaro agreed that Todaro would remain with AAT, Inc. so that he could continue to collect compensation from Plaintiff while covertly working for the benefit of Flowcastings.   Defendant Todaro also had unlimited and unfettered access to Plaintiffs'

technologies and resources – by virtue of his position with AAT, Inc. – which allowed Todaro to transfer Plaintiffs' proprietary technology and confidential information to Flowcastings.

43.     To hasten Flowcastings entry into the marketplace, Todaro and other Defendants began testing DS/SX casting molds using Plaintiffs' technologies and resources in the Spring 2011.  With the assistance of Defendants Konrad, Tarby and Chalder, Todaro utilized Plaintiffs' technologies and resources to manufacture DS/SX castings that he removed from Plaintiffs' manufacturing facility upon his resignation on June 4, 2011.  Plaintiffs are informed and believe, and based thereon allege that Flowcastings is in possession of the DS/SX castings manufactured by Todaro at Plaintiffs' facility.

44.     Also, to more quickly permit Flowcastings to enter the marketplace, Todaro and other Defendants completed a number of steps needed to earn International Standards Organization (hereinafter "ISO") certification for Flowcastings.  ISO certification is a crucial requirement for any company in the industry and obtaining certification is a pre-requisite in pursuing potential customers.   In furtherance of their plan, Defendants completed a number of steps to obtain ISO certification for Flowcastings while they were still employed and being compensated by Plaintiffs.

45.     Thereafter, Todaro secretly set out to sabotage AAT Germany's operations and intentionally sought to damage Plaintiffs' customer relationships by failing to timely respond to customer inquiries, failing to pursue or engage new business opportunities, and actively sabotaged team building efforts by secretly denigrating AAT Germany and its prospective business future to other AAT Germany team members, including but not limited to Peter Konrad, once a senior management team member at AAT Germany, now employed by Flowcastings.

12

## E. *Byrd, Flutto and Todaro Begin Secretly Hiring Other Employees*

46.    Starting in June 2011, Flowcastings began secretly hiring other AAT Germany and AAT, Inc. employees for its Nuremburg, Germany manufacturing facility. Plaintiffs are informed and believe, and based thereon allege, that Flutto and Byrd directed those employees to continue to hold their positions with AAT Germany and/or AAT, Inc. but to take extensive sick and vacation time in order to work for Flowcastings – while collecting compensation from Plaintiffs. By virtue of their positions as executive level management with Plaintiffs, Defendants Byrd and Flutto are knowledgeable of the fact that German law forbids an employer from disciplining employees for use of sick and/or vacation time.

47.    Thereafter, a number of Plaintiffs' employees began to take sick and vacation time, starting with Fabian Korb. During the first week of July 2011, Korb requested a two-week paid vacation to reportedly travel to Dubai, United Arab Emirates.

48.    Thereafter, Plaintiffs learned that Korb never traveled to Dubai and instead used his two-week paid vacation to travel to Nuremburg, Germany to pass on Plaintiffs' proprietary information and assist Flowcastings and their management team in setting up a manufacturing plant there. Plaintiffs are informed and believe, and based thereon allege, that Korb immediately tendered his resignation – upon his return – in order to accept a similar position with Flowcastings.

49.    In the middle of July 2011, AAT Germany's former Engineering Manager, Peter Konrad reported that he would need to take a leave of absence from AAT Germany's European manufacturing facility as a result of a knee problem he was experiencing. Konrad requested and was granted a week and a half off to attend a doctor's appointment.

50.     After Todaro resigned from AAT, Inc., on June 4, 2011, Konrad suffered serious performance issues due to his repeated absences from AAT Germany's manufacturing facility. Konrad's performance issues related to the work he was doing for Flowcastings.  As a result, AAT Germany's senior management team was left little choice and decided not to renew Konrad's employment contract.  Konrad was notified in July 2011 that his contract would not be renewed.

51.     At Konrad's request, AAT Germany's Director of Casting, Gene Lansdell, permitted Konrad to remain employed with AAT Germany through the end of August 2011. Konrad returned to AAT Germany the first week of August, but took off the remaining three weeks of August, purportedly to have his knee operated on.

52.     Konrad used the last three weeks of August 2011 – while still purportedly working for AAT Germany – to assist Flowcastings' plant operations in Nuremburg, Germany. Konrad had surgery on his knee only two days prior to his last days of employment with AAT Germany at the end of August 2011.

53.     On information and belief, Konrad, at the direction of Byrd and Flutto, requested an extra month of employment with AAT Germany in order to access, copy onto external hard drives and remove Plaintiffs' highly valuable and sensitive electronic data, consisting of confidential, proprietary and trade secret information relating to AAT Germany's business and clients.  Konrad currently serves as Flowcastings' Product Engineering Manager.

54.     Next, in August 2011, AAT Germany's former Program Manager, Bernd Leonhardt, began to take repeated days off from AAT Germany's manufacturing facility. Leonhardt had a contract with AAT Germany which, by its terms, necessitated that he be present in the Bayreuth production facility at least four days a week.  Leonhardt was failing to honor his

14

contract and when approached by AAT Germany's senior management team and asked to honor his contract, Leonhard refused. He was immediately terminated by Lansdell.

55. Plaintiff is informed and believes, and based thereon alleges that Leonhardt's sustained absences from the manufacturing facility were a result of the work he was doing for Flowcastings. Further, Plaintiff is informed and believes, and based thereon alleges that Leonhardt is currently employed with Flowcastings.

56. Much like Defendant Todaro, Leonhardt also destroyed vital proprietary and trade secret information from his computer and on information and belief, deleted and deliberately sabotaged AAT Germany's vital research, files and quality control results – specifically related to vital American based customers – in an attempt to cripple AAT Germany's manufacturing facility and damage Plaintiffs' relationship with their American based customers.

57. As a result of Leonhardt's actions, AAT, Inc. was forced to find technical expertise in the United States to replicate and recreate the work deleted by Leonhardt employees now working for Flowcastings in order to ensure timely delivery of AAT Germany's products to Plaintiffs' American based customers.

**F.    *Plaintiffs Discover Defendants' Scheme***

58. On October 13, 2011, AAT Inc.'s Director, R. Seth Armstrong, was inadvertently copied on an email from Graham Durber, Marketing & Technical Manager, Europe of Western Australian Specialty Alloys, answering an October 10, 2011, email from Herve Flutto, regarding the supply of alloy for a new venture he was setting up: Flowcastings.

59. A PowerPoint Presentation was attached to Defendant Flutto's October 10, 2011 email presenting the "robust management team" of Flowcastings – which incidentally are all former members of AAT Germany's senior management group, including:

15

a. Charles Byrd, CEO

b. Dan Abbassi, President

c. Thomas Todaro, CTO

d. Herve Flutto, CFO

e. Peter Konrad, Product Engineer Manager

60. The Flowcastings technology described by Flutto in the October 10, 2011 email PowerPoint Presentation is virtually identical to Plaintiffs' proprietary technology.

### G. Defendants' Unlawful Taking of Plaintiffs' Information

61. By reason of their employment positions with Plaintiffs, Defendants had access to Plaintiffs' confidential, proprietary and trade secret information.

62. Specifically, the Defendants each had a company issued email address and many had company issued computers that were connected to Plaintiffs' secure electronic network and Plaintiffs' secure server network. At all times relevant hereto, Plaintiffs owned the computer and proprietary, confidential and trade secret information, which were entrusted to Defendants in their capacities as key employees of AAT.

63. After R. Seth Armstrong received the October 10, 2011 email regarding Flowcastings, AAT began a review of Defendants' computer records and emails. Plaintiffs discovered that Defendants had copied, emailed to their personal email address and/or printed confidential and proprietary trade secret information from their work computers. Plaintiffs also discovered emails openly discussing Defendants' roles at Flowcastings and work that each could do to advance Flowcastings' operations.

## COUNT I
### (Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*)
### (Against All Defendants)

64.     Plaintiffs incorporate by reference each of the allegations in the preceding paragraphs of this Verified Complaint as though fully set forth herein.

65.     Defendants have violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C), by intentionally accessing a computer used for interstate commerce or communication, without authorization or by exceeding authorized access to such a computer, and by obtaining information from such a protected computer.

66.     Defendants have violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4) by knowingly, and with intent to defraud Plaintiffs, accessing a protected computer, without authorization or by exceeding authorized access to such a computer, and by means of such conduct furthered the intended fraud and obtained one or more things of value, including but not limited to Plaintiffs' proprietary technology and software.

67.     Defendants were not authorized by Plaintiffs to access Plaintiffs' computer systems for improper gain, including to access, delete and/or copy electronic information files, send electronic files to USB memory devices or other storage devices, and/or print confidential or trade secret materials from Plaintiffs' computer network, nor were the Defendants authorized to continue to possess Plaintiffs' electronic files and data following their employment with Plaintiffs for the benefit of themselves of a third party, including but not limited to Flowcastings, nor were Defendants authorized to upload or maintain Plaintiffs' confidential and trade secret data on Flowcastings network server, as such acts damaged and/or impaired the integrity of Plaintiffs' confidential and trade secret data and/or computer system.

68.     Plaintiffs have expended or otherwise lost more than $5,000.00 to investigate and remedy Defendants' breaches and in lost business or opportunities as a result of Defendants' unauthorized access to Plaintiffs' computer system.

69.     Defendants:

a.  Intentionally accessed a computer system authorization or exceeded their authority to obtain information from a protected computer causing damage in excess of $5,000.00 in violation of 18 U.S.C. § 1030(a)(2)(C).

b.  Knowingly and with intent to defraud, accessed a protected computer without authorization or exceeded their authority, and by means of such conduct furthered the intended fraud and obtained valuable information resulting in damages exceeding $5,000.00 in violation of 18 U.S.C. § 1030(a)(4).

c.  Knowingly caused the transmission of a program, information, code, or command, and as a result of such conduct, intentionally caused damage without authorization, to a protected computer network in excess of $5,000.00 in violation of 18 U.S.C. § 1030(a)(5)(A)(i); and/or

d.  Intentionally accessed a protected computer without authorization of exceeded their authority, and as a result of such conduct, caused damage in excess of $5,000.00 in violation of 18 U.S.C. § 1030(a)(5)(A)(iii).

70.     The computer system or systems that Defendants have accessed as described above constitute a "protected computer" within the meaning of 18 U.S.C. § 1030(e)(2).

71.     Plaintiffs have suffered damage and loss as a result of Defendants' unlawful actions in an amount to be determined at trial, but, in any event, well in excess of $5,000.00 aggregated over a one-year period.

72.     Defendants' unlawful access to and theft from Plaintiffs' computers have caused Plaintiffs irreparable injury.  Unless restrained and enjoined, Defendants will continue to commit such acts.  Plaintiffs' remedy at law is not adequate to compensate it for these inflicted and threatened injuries, entitling Plaintiff to remedies including injunctive relief as provided by 18 U.S.C. § 1030(g).

## COUNT II
### (Violations of the New York Trade Secret Act)
### (Against All Defendants)

73.     Plaintiffs incorporate by reference each of the allegations in the preceding paragraphs of this Verified Complaint as though fully set forth herein.

74.     The confidential and/or proprietary business and customer information accessed, copied and removed by the Defendants from Plaintiffs' computer system constitutes trade secrets because Plaintiffs derive independent economic value from said information, such information is not generally known or readily accessible by proper means by other persons who can obtain economic value from its disclosure or use, and the because the information is the subject of reasonable efforts by Plaintiffs to maintain its secrecy.

75.     The Defendants' misappropriation of Plaintiffs' trade secrets is in violation of the New York Trade Secrets Act

76.     Defendants established, became employed by and/or affiliated with Flowcastings, a competitor of AAT Germany, and the Defendants have used and disclosed AAT's trade secrets and/or confidential information for the benefit of themselves and third parties.

77.     The Defendants already have and/or will continue to be unjustly enriched by their misappropriation of AAT's trade secrets and confidential information.

78.     The Defendants' misappropriation was done willfully and maliciously.

79.     By reason of the Defendants' willful and malicious misappropriation of Plaintiffs' confidential and trade secret information, Plaintiffs are entitled to damages, plus an award of exemplary damages from the Defendants in such amount as common law requires to punish the Defendants and deter them from the commission of like acts and, in addition, reasonable attorney's fees.

19

## COUNT III
### (Civil Conspiracy)
### (Against All Defendants)

80.     Plaintiffs incorporate by reference each of the allegations in the preceding paragraphs of this Verified Complaint as though fully set forth herein.

81.     Defendants willfully, intentionally, and knowingly agreed and conspired with each other to engage in alleged wrongful conduct, including Defendants' interference with Plaintiffs' business relationships and other unfair business practices, as well as Defendants' trespass on, computer fraud and conversion of Plaintiffs' technologies.     Defendants all participated in this corrupt agreement.

82.     Defendants did the acts alleged pursuant to, and in furtherance of, that agreement and/or furthered the conspiracy by cooperating, encouraging, ratifying, or adopting the acts of others.  The actions committed in furtherance of the Defendants' corrupt agreement include: (1) taking Plaintiffs' confidential, proprietary and trade secret information; (2) destroying Plaintiffs' confidential research and test results; (3) using Plaintiffs' confidential, proprietary and trade secret information to contact Plaintiffs' customers.

83.     As a direct and proximate result of the acts in furtherance of the conspiracy, Plaintiffs have suffered injury, damage, loss, and harm, including, but not limited to, loss of profits from sales to current and potential customers.  The wrongful conduct committed pursuant to the civil conspiracy was a substantial factor in causing this harm.

84.     Defendants' intentional agreement to commit, and commission of, these wrongful acts was willful, malicious, oppressive, and in conscious disregard for Plaintiffs' rights, and Plaintiff is therefore entitled to an award of punitive damages to punish their wrongful conduct and deter future wrongful conduct.  All Defendants participated in this conspiracy.

## COUNT IV
### (Conversion)
### (Against All Defendants)

85.     Plaintiffs incorporate by reference each of the allegations in the preceding paragraphs of this Verified Complaint as though fully set forth herein.

86.     The Defendants removed from AAT Germany and/or retained its property, including but not limited to, confidential and proprietary information, without authorization, and converted it for their own use, including, but, not limited to, transferring Plaintiff's information and property onto Flowcastings' network server.

87.     Plaintiffs have demanded from the Defendants the return of the converted data.

88.     Plaintiffs are entitled to return of their property.

89.     Defendants have failed to return Plaintiffs' property.

90.     Plaintiffs have suffered damages as a direct and proximate result of the Defendants' actions in an amount to be determined at trial.  Because the Defendants' actions have been willful, malicious, outrageous, oppressive or done in complete disregard for the consequences they might have for Plaintiffs, an award of exemplary and punitive damages in an amount to be proven at trial is proper.

## COUNT V
### (Tortious Interference With Contract)
### (Against All Defendants)

91.     Plaintiffs incorporate by reference each of the allegations in the preceding paragraphs of this Verified Complaint as though fully set forth herein.

92.     At the time Defendants commenced employment with Flowcastings, it was well aware that Plaintiffs' former employees were subject to contractual prohibitions against disclosing or using Plaintiffs' confidential, proprietary and/or trade secret information, and were

required to return to Plaintiffs and not retain any such confidential, proprietary and/or trade secret information belonging to Plaintiffs upon the termination of their employment.

93.     Nonetheless, Defendants intentionally, unjustifiably and without privilege interfered with certain Defendants contractual obligations to AAT Germany and AAT, Inc. by inducing those Defendants to disclose and use Plaintiff's confidential, proprietary and/or trade secret information in the course of performing their job duties for Flowcastings.

94.     As a direct and proximate result of Defendants conduct, Plaintiffs have been damaged in an amount to be determined at trial.

**COUNT VI**
**(Tortious Interference With Prospective Economic Advantage)**
**(Against All Defendants)**

95.     Plaintiffs incorporate by reference each of the allegations in the preceding paragraphs of this Verified Complaint as though fully set forth herein.

96.     Plaintiffs have developed and maintain an advantageous actual and prospective business relationship with clients, and have a reasonable expectation that it will continue to do business with and service its clients. Such client relationships promise a continuing probability of future economic benefit to Plaintiffs.

97.     Plaintiffs also have a reasonable expectation that Defendants will honor and abide by their contractual and common law obligations owed to Plaintiffs, and that Flowcastings, as Defendants' new employer, will likewise respect the obligations Defendants continue to owe to Plaintiffs.

98.     Defendants knew of Plaintiffs' advantageous actual and prospective business relationships with its clients, including the existence of Plaintiffs' reasonable expectation that it

would continue to do business with and service its clients and that Defendants would adhere to an not breach their continuing contractual and common law obligations owed to Plaintiffs.

99.     Despite having knowledge of Plaintiffs' expectancy, Defendants have intentionally and purposefully interfered with Plaintiffs' relationships with its clients by, among other things, directly and or indirectly attempting to induce Plaintiffs' clients to do business with Flowcastings instead of Plaintiffs through the use and/or disclosure of Plaintiffs' confidential and/or proprietary information.

100.     As a direct and proximate result of such conduct, Plaintiffs' legitimate expectation of continued business with and from certain clients has been prevented from developing into a valid business relationship.

101.     As a direct and proximate result of Defendants' tortious interference with prospective economic advantage, Plaintiffs have been damaged in an amount to be determined at trial.

**COUNT VII**
**(Breach of Fiduciary Duty)**
**(Against Defendants Flutto, Byrd and Todaro)**

102.     Plaintiffs incorporate by reference each of the allegations in the preceding paragraphs of this Verified Complaint as though fully set forth herein.

103.     Defendants Flutto, Byrd and Todaro owed fiduciary duties to Plaintiff because they served as executive level management of Plaintiffs, which required Plaintiff to bestow its utmost trust and confidence in Defendants Flutto, Byrd and Todaro. Defendants' fiduciary duties to Plaintiffs included the duties of utmost care, good faith, loyalty, fairness, honest and full disclosure.

104.    Defendants breached these fiduciary duties by the acts and omissions described above, by advancing their own commercial and private interests at the expense of Plaintiffs and by misappropriating for itself the opportunities belonging to Plaintiffs.

105.    Plaintiffs have suffered and will continue to suffer substantial damages as a result of Defendants' breached of their fiduciary duties.

106.    Plaintiffs request a jury trial of all claims and issues so triable.

## RELIEF REQUESTED

**WHEREFORE,** Plaintiffs seek judgment in their favor and the following relief:

A.    An order requiring the Defendants to account for and return any and all copies of Plaintiff's property in their possession, custody or control, including by not limited to any and all forms of electronic data belonging to Plaintiffs;

B.    An order prohibiting the Defendants from directly or indirectly using or disclosing any of Plaintiff's confidential, proprietary and/or trade secret information for the benefit of themselves or any third party.

C.    The actual losses sustained by Plaintiffs as a result of the Defendants' actions complained of herein, including but not limited to Plaintiff's actual loss caused by the Defendants' misappropriation of Plaintiff's confidential and trade secret information and the Defendants' unjust enrichment caused by said misappropriation that is not taken into account in computing actual loss; or in the absence of actual damages or of unjust enrichment, a reasonable royalty for the Defendants' unauthorized use and/or disclosure of Plaintiff's confidential and trade secret information;

D.    An award of exemplary or punitive damages in an amount to be proven at trial, including but not limited to exemplary damages due to the Defendants' misappropriation of

Plaintiff's confidential and trade secret information in an amount twice that awarded for actual

damages and unjust enrichment, or for a reasonable royalty in the absence of proof of actual

damages and unjust enrichment;

     E.     An award of interest, costs, and attorneys' fees; and

     F.     Such other relief as the Court deems just and proper.

Dated: December 23, 2011              **Respectfully Submitted,**

**ADVANCED AEROFOIL
TECHNOLOGIES, AG,** *et al.,*
**Plaintiffs,**

/s/ Roger J. Maldonado
One of their Attorneys

**BALBER PICKARD MALDONADO
& VAN DER TUIN, PC**
Roger J. Maldonado
1370 Avenue of the Americas, 7th Floor
New York, New York 10019-4602
Tel: (212) 246-2600
Fax: (212) 765-4212

**CRONIN & CO., LTD.**
Thomas C. Cronin
Aaron L. Davis
233 South Wacker Dr., Ste 2100
Chicago, IL 60606
Tel: (312) 201-7100
Fax: (312) 201-7101

## VERIFICATION

I, R. Seth Armstrong, Director of AAT, Inc., a Plaintiff in the above entitled action, and pursuant to 28 U.S.C. 1746, hereby verify under penalty of perjury and the laws of the United States of America that the foregoing is true and correct and, in connection with statements made on information and belief, that he verily believes the same to be true.

Dated:     December 2̶4̶, 2011

## AFFIDAVIT OF PAUL S. WOLFE

I, **PAUL S. WOLFE**, being first duly sworn upon my oath, make this Affidavit and state as follows:

1.      I am over the age of twenty-one, suffer no legal disabilities, have personal knowledge of the facts set forth below, and am competent to testify.

2.      I serve as a Director of Advanced Aerofoil Technologies, AG (hereinafter "AAT AG"), a Swiss Corporation.  AAT AG is the parent corporation of AAT, Inc. (hereinafter "AAT, Inc.") and AAT GmbH (hereinafter "AAT Germany").  I also serve as a Director of AAT Inc.

3.      AAT Germany, a subsidiary of AAT AG, was established as an Equiax-only casting foundry for the development and manufacture of precision investment castings for the power generation and transportation industries.  AAT Germany's manufacturing facility is not currently equipped to develop Directionally Solidified or Single Crystal precision investment castings (hereinafter "DS/SX").

4.      AAT, Inc. is headquartered at 20 North Wacker Street, Suite 3720, Chicago, Illinois and is tasked, among other commercial duties, with building a DS/SX manufacturing facility for AAT in the United States.  In fact, AAT, Inc.'s DS/SX manufacturing facility was being actively pursued when the Defendants' actions were uncovered in October 2011.  Additionally, AAT, Inc. maintains United States based client accounts for AAT Germany's manufacturing facility.

5.      In June 2011, I became aware that Thomas Todaro, Anthony Chalder, Mark Tarby and Advanced Engineering Technologies, Inc. had all collectively resigned their positions with AAT, Inc. – effective immediately.   At the end of March, 2011, Charles Byrd (former Chief Executive Officer of AAT) constructively abandoned his position, claiming that a contract amendment he was unaware of that Herve Flutto had just discovered as a matter of



EXHIBIT
A

"housekeeping" indicated that lo and behold, he had been constructively dismissed and therefore he was entitled to the contract's severance package.

6.      After Byrd's departure, upon independent investigation, I learned among other things, that Flutto and Byrd had misled corporate counsel in order to create for themselves amendments to their employment agreements in early March, 2011 that were adverse to shareholders (e.g., waiving of non-compete clauses, increases in severance compensation, additions to triggering events) and were not discussed at all with the 98.2% shareholder at that time (now 100%), contrary to representations made by Flutto to corporate counsel in their drafting of such amendments in early March, 2011. Both the March, 2011 date of the drafting of the amendments and the misrepresentations by Flutto have been subsequently confirmed by AAT's corporate counsel.   As if this were not egregious enough, without the knowledge of corporate counsel, Flutto and Byrd not only executed these March, 2011 amendments without consultation with the 98.2% shareholder, but backdated these self-dealing amendments to November 30, 2010 as well. The amendments were then presented deceitfully at the end of March, 2011, hours after the triggering event mutually discussed and agreed upon in advance had been officially posted in the corporate register, that as part of a random housekeeping exercise a contract amendment from November 30, 2010 had been discovered that indicated that Byrd had been constructively dismissed and now entitled to his severance package.

7.      At that time, I had no idea that Flutto and Byrd were actively working to establish a competing venture built on Plaintiff's confidential and proprietary information.   Additionally I had no idea at that time that Todaro, Chalder, Tarby and AET were also actively participating in these extraordinary and malicious acts of theft and self-dealing right up to their abrupt departure in June, 2011 and thereafter.

8. I was unable to imagine such an egregious fraudulent undertaking by these individuals when I first began to put together a Termination Agreement in the Summer of 2011. Charles Byrd had been a colleague, for example, at a former employer. I thought I was dealing with individuals misbehaving out of a fear of not having a severance package, rather than individuals behaving in bad faith for whom the severance package manipulation was but one part of a broad, deep, highly pre-mediated and malicious pattern of theft of business and self-dealing. Nor did all of the individuals I was dealing with have altered employment agreement documents that I had to address. On September 2, 2011, I signed termination agreements with Byrd, Todaro, AET and two other non-parties to this litigation.

9. As part of these negotiations and agreements, each side fully contemplated and agreed to arbitration before the American Arbitration Association in New York and that the parties could also, if necessary, seek injunctive relief in New York as well.

10. Of course, at that time that Plaintiffs entered into the termination agreement with Defendants, I had no idea the breadth of Defendants' wholesale and breathtaking self-dealing. Among other things, I would later discover that Defendants' had stolen Plaintiffs' intellectual property, trade secrets, technologies, resources, customer lists and information, amongst other things, and concealed it from Plaintiffs while inducing me to sign the termination agreement. Defendants' misconduct was deliberately designed to harm AAT Germany's operations and preempt AAT, Inc.'s entry into the DS/SX market, so that Flowcastings could entered the DS/SX market first and steal AAT, Inc.'s current and prospective clients.

11. In October 2011, one month after the termination agreement was executed, I learned that my colleague R. Seth Armstrong, a Director of AAT, Inc., had uncovered a scheme dating back to the beginning of 2011 in which Defendants were systematically stealing from

3

AAT for the benefit of themselves and a competitor they were establishing.  Mr. Armstrong and I conducted an investigation and uncovered the following facts:

    a. Todaro purposefully failed to engage and pursue new customer opportunities; unilaterally push based deadlines for completion and deliver of customer orders; purposefully stalled Chalder's and Tarby's arrival at the Bayreuth facility and sent cryptic emails related to product design and product test results.

    b. Todaro was secretly soliciting AAT, Inc. and AAT Germany employees to join him at a competing venture that he and other former employees formed while still employed with AAT AG, AAT, Inc. and/or AAT Germany.

    c. Todaro deleted proprietary and trade secret information from his computer sabotaged AAT Germany's vital research, files and quality control results in an attempt to cripple AAT Germany's European manufacturing facility.

    d. Todaro's emails and computer database revealed that he and other AAT Germany and/or AAT, Inc. employees used the AAT Germany manufacturing facility property and technology to begin the lengthy process of earning International Standards Organization (hereinafter "ISO") certification for Flowcastings, GmbH. ISO certification is a crucial requirement for any company in our industry and is needed in order to pursue potential customers.  While secretly working for Flowcastings, GmbH, Todaro completed a number of the initial steps to obtain ISO certification while he was still employed and being compensated by AAT, Inc.

    e. Armstrong discovered and shared with me emails and documents in Todaro's deleted items folder on his company issued laptop that revealed Todaro and other

4

former AAT Germany and/or AAT, Inc. employees utilized Plaintiffs' resources and technology to develop DS/SX castings.    While secretly working for Flowcastings, Todaro and other Defendants completed a number of steps and tests to develop DS/SX castings in order to beat Plaintiff into that market.

12.    The files copied, emailed, downloaded and/or printed by these former employees during the time they secretly were forming Flowcastings, GmbH contained highly sensitive information not disseminated into the public domain.

13.    If Defendants are allowed to take improperly Plaintiffs' confidential, proprietary and trade secret information to establish this competing venture, Plaintiffs will all suffer irreparable harm by losing the value they have created from the significant investments they have made in their equipment, business operations and know-how.

14.    Flowcastings, LLC's senior management team is selectively targeting specific AAT, Inc. and AAT Germany employees whom they know possess knowledge of AAT Germany's confidential, proprietary and trade secret information.

15.    As a result of this breathtaking and systematic theft of Plaintiffs' proprietary, confidential and trade secret information by Defendants, we have no choice but to file this Verified Complaint and seek injunctive relief.

*FURTHER, AFFIANT SAITH NOT.*

**SWORN DECLARATION PURSUANT TO 28 U.S.C. § 1746(2)**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

SIGNED this 20th day of December, 2011

PAUL WOLFE

5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ADVANCED AEROFOIL TECHNOLOGIES,
AG, a Swiss Corporation, ADVANCED AEROFOIL
TECHNOLOGIES, INC. a Delaware Corporation,
and ADVANCED AEROFOIL TECHNOLOGIES,
GmbH, a German Corporation,

Plaintiffs,

- against -

THOMAS TODARO, ANTHONY CHALDER,
MARK TARBY, as Individuals, ADVANCED
ENGINEERING TECHNOLOGIES, INC., a New
Jersey Corporation, FLC FLOWCASTINGS, GmbH,
a German Corporation, and PETER KONRAD,
HERVE FLUTTO, DANIEL ABBASI, FABIAN
KORB, CHARLES BYRD and BERND
LEONHARDT as individuals,

Defendants.

COMPLAINT

Balber Pickard
Maldonado & Van Der Tuin, PC
1370 Avenue of the Americas
New York, New York 10019-4602
212 246-2400